## MICHELIN TIRE CORP. *v.* WAGES, TAX COMMISSIONER, ET AL.

No. 74–1396. Argued October 15, 1975—Decided January 14, 1976

BRENNAN, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, MARSHALL, BLACKMUN, POWELL, and REHNQUIST, JJ., joined. WHITE, J., filed an opinion concurring in the judgment, *post,* p. 302. STEVENS, J., took no part in the consideration or decision of the case.

*Earle B. May, Jr.,* argued the cause for petitioner. With him on the brief were *F. M. Bird, Edward R. Kane,* and *E. A. Dominianni.*

*Hosea Alexander Stephens, Jr.,* argued the cause for

respondents. With him on the brief was *Homer M. Stark.**

MR. JUSTICE BRENNAN delivered the opinion of the Court.

Respondents, the Tax Commissioner and Tax Assessors of Gwinnett County, Ga., assessed ad valorem property taxes against tires and tubes imported by petitioner from France and Nova Scotia that were included on the assessment dates in an inventory maintained at its wholesale distribution warehouse in the county. Petitioner brought this action for declaratory and injunctive relief in the Superior Court of Gwinnett County, alleging that with the exception of certain passenger tubes that had been removed from the original shipping cartons,[1] the ad valorem property taxes assessed against

---

*Curt T. Schneider,* Attorney General, and *Jonathan P. Small* and *Clarence J. Malone,* Assistant Attorneys General, filed a brief for the State of Kansas et al. as *amici curiae* urging affirmance.

Briefs of *amici curiae* were filed by *Arthur K. Bolton,* Attorney General, *Robert S. Stubbs II,* Chief Deputy Attorney General, *Richard L. Chambers,* Deputy Attorney General, *H. Perry Michael,* Senior Assistant Attorney General, and *David A. Runnion,* Assistant Attorney General, for the State of Georgia; by *William J. Brown,* Attorney General, and *John C. Duffy, Jr.,* Assistant Attorney General, for the Tax Commissioner of Ohio; and by *John H. Larson, James Dexter Clark, Jonathan Day, Leonard Putnam, Richard W. Marston, Richard J. Moore, Robert M. Wash, Douglas J. Maloney, Adrian Kuyper, Ray T. Sullivan, Jr., John B. Heinrich, William Sabourin, George P. Kading, William M. Siegel, Byron D. Athan, Robert A. Rehberg, Thomas B. Sawyer, Calvin E. Baldwin, Charles R. Mack, Joseph Kase, Jr., Thomas M. O'Connor,* and *John J. Doherty* for the county of Los Angeles, California, et al.

[1] Petitioner's complaint conceded the taxability of certain passenger tubes that had been removed from the original shipping cartons. These had a value of $633.92 on the assessment date January 1, 1972, and of $664.22 on the assessment date January 1, 1973. The tax for 1972 on the tubes was $8.03 and for 1973 was $8.73.

its inventory of imported tires and tubes were prohibited by Art. I, § 10, cl. 2, of the Constitution, which provides in pertinent part: "No State shall, without the Consent of the Congress, lay any Imposts or Duties on Imports or Exports, except what may be absolutely necessary for executing its inspection Laws . . . ." After trial, the Superior Court granted the requested declaratory and injunctive relief. On appeal, the Supreme Court of Georgia affirmed in part and reversed in part, agreeing that the tubes in the corrugated shipping cartons were immune from ad valorem taxation, but holding that the tires had lost their status as imports and had become subject to such taxation because they had been mingled with other tires imported in bulk, sorted, and arranged for sale. 233 Ga. 712, 214 S. E. 2d 349 (1975). We granted certiorari, 422 U. S. 1040 (1975). The only question presented is whether the Georgia Supreme Court was correct in holding that the tires were subject to the ad valorem property tax.[2] We affirm without addressing the question whether the Georgia Supreme Court was correct in holding that the tires had lost their status as imports. We hold that, in any event, Georgia's assessment of a nondiscriminatory ad valorem property tax against the imported tires is not within the constitutional prohibition against laying "any Imposts or Duties on Imports . . ." and that insofar as *Low* v. *Austin*, 13 Wall. 29 (1872) is to the contrary, that decision is overruled.

## I

Petitioner, a New York corporation qualified to do business in Georgia, operates as an importer and whole-

---

[2] The respondents did not cross-petition from the affirmance of the holding of the Superior Court that the tubes in the corrugated shipping cartons were immune from the tax, and that holding is therefore not before us for review.

sale distributor in the United States of automobile and truck tires and tubes manufactured in France and Nova Scotia by Michelin Tires, Ltd. The business is operated from distribution warehouses in various parts of the country. Distribution and sale of tires and tubes from the Gwinnett County warehouse is limited to the 250–300 franchised dealers with whom petitioner does all of its business in six southeastern States. Some 25% of the tires and tubes are manufactured in and imported from Nova Scotia, and are brought to the United States in tractor-driven, over-the-road trailers packed and sealed at the Nova Scotia factory. The remaining 75% of the imported tires and tubes are brought to the United States by sea from France and Nova Scotia in sea vans packed and sealed at the foreign factories. Sea vans are essentially over-the-road trailers from which the wheels are removed before being loaded aboard ship. Upon arrival of the ship at the United States port of entry, the vans are unloaded, the wheels are replaced, and the vans are tractor-hauled to petitioner's distribution warehouse after clearing customs upon payment of a 4% import duty.

The imported tires, each of which has its own serial number, are packed in bulk into the trailers and vans, without otherwise being packaged or bundled. They lose their identity as a unit, however, when unloaded from the trailers and vans at the distribution warehouse. When unloaded they are sorted by size and style, without segregation by place of manufacture, stacked on wooden pallets each bearing four stacks of five tires of the same size and style, and stored in pallet stacks of three pallets each. This is the only processing required or performed to ready the tires for sale and delivery to the franchised dealers.

Sales of tires and tubes from the Gwinnett County

distribution warehouse to the franchised dealers average 4,000–5,000 pounds per sale. Orders are filled without regard to the shipments in which the tires and tubes arrived in the United States or the place of their manufacture. Delivery to the franchised dealers is by common carrier or customer pickup.

## II

Both Georgia courts addressed the question whether, without regard to whether the imported tires had lost their character as imports, Georgia's nondiscriminatory ad valorem tax fell within the constitutional prohibition against the laying by States of "any Imposts or Duties on Imports . . . ." The Superior Court expressed strong doubts that the ad valorem tax fell within the prohibition but concluded that it was bound by this Court's decisions to the contrary. The Superior Court stated:

> "While it would seem that where said tires and tubes have been placed in [petitioner's] general inventory for the purpose of sale to its customers, . . . such inventory should be taxed to the same extent as any other inventory of any other business in Gwinnett County, and the Court would so hold if supported by the law, it is clear that where the property is imported for resale it retains its import exemption from ad valorem taxes until after such sale," "[for] [t]he immunity of imported goods from local taxation includes immunity from local ad valorem property taxes; *Hooven & Allison Company* v. *Evatt,* 324 U. S. 652; *Low* v. *Austin,* 80 U. S. 29." Pet. for Cert., App. A–4, A–3.

Similarly, the Georgia Supreme Court stated, 233 Ga., at 722, 214 S. E. 2d, at 355:

> "[Petitioners] argue that an annual ad valorem tax is not a tax on imports within the meaning of

the federal constitutional provision. We reject this argument on the basis of the above-cited authority. [*E. g., Low* v. *Austin.*]"

*Low* v. *Austin, supra,* is the leading decision of this Court holding that the States are prohibited by the Import-Export Clause from imposing a nondiscriminatory ad valorem property tax on imported goods until they lose their character as imports and become incorporated into the mass of property in the State. The Court there reviewed a decision of the California Supreme Court that had sustained the constitutionality of California's nondiscriminatory ad valorem tax on the ground that the Import-Export Clause only prohibited taxes upon the character of the goods as imports and therefore did not prohibit nondiscriminatory taxes upon the goods as property. See 13 Wall., at 30–31. This Court reversed on its reading of the seminal opinion construing the Import-Export Clause, *Brown* v. *Maryland,* 12 Wheat. 419 (1827), as holding that "[w]hilst retaining their character as imports, a tax upon them, in any shape, is within the constitutional prohibition." 13 Wall., at 34.

Scholarly analysis has been uniformly critical of *Low* v. *Austin.* It is true that Mr. Chief Justice Marshall, speaking for the Court in *Brown* v. *Maryland, supra,* at 442, said that "while [the thing imported remains] the property of the importer, in his warehouse, in the original form or package in which it was imported, a tax upon it is too plainly a duty on imports to escape the prohibition in the constitution." Commentators have uniformly agreed that *Low* v. *Austin* misread this dictum in holding that the Court in *Brown* included nondiscriminatory ad valorem property taxes among prohibited "imposts" or "duties," for the contrary conclusion is plainly to be inferred from consideration of the specific abuses which led the Framers to include the Import-

Export Clause in the Constitution. See, *e. g.,* Powell, State Taxation of Imports—When Does an Import Cease to Be an Import?, 58 Harv. L. Rev. 858 (1945); Note, The Supreme Court, 1958 Term, 73 Harv. L. Rev. 126, 176 (1959); Early & Weitzman, A Century of Dissent: The Immunity of Goods Imported for Resale From Nondiscriminatory State Personal Property Taxes, 7 Sw. U. L. Rev. 247 (1975); Dakin, The Protective Cloak of the Export-Import Clause: Immunity for the Goods or Immunity for the Process?, 19 La. L. Rev. 747 (1959).

Our independent study persuades us that a nondiscriminatory ad valorem property tax is not the type of state exaction which the Framers of the Constitution or the Court in *Brown* had in mind as being an "impost" or "duty" and that *Low* v. *Austin's* reliance upon the *Brown* dictum to reach the contrary conclusion was misplaced.

## III

One of the major defects of the Articles of Confederation, and a compelling reason for the calling of the Constitutional Convention of 1787, was the fact that the Articles essentially left the individual States free to burden commerce both among themselves and with foreign countries very much as they pleased. Before 1787 it was commonplace for seaboard States with port facilities to derive revenue to defray the costs of state and local governments by imposing taxes on imported goods destined for customers in other States. At the same time, there was no secure source of revenue for the central government. James Madison, in his Preface to Debates in the Convention of 1787, 3 M. Farrand, The Records of the Federal Convention of 1787, p. 542 (1911) (hereafter Farrand), provides a graphic description of the situation:

> "The other source of dissatisfaction was the peculiar situation of some of the States, which having no

convenient ports for foreign commerce, were subject to be taxed by their neighbors, thro whose ports, their commerce was carryed on. New Jersey, placed between Phila. & N. York, was likened to a Cask tapped at both ends: and N. Carolina between Virga. & S. Carolina to a patient bleeding at both Arms. The Articles of Confederation provided no remedy for the complaint: which produced a strong protest on the part of N. Jersey; and never ceased to be a source of dissatisfaction & discord, until the new Constitution, superseded the old." [3]

And further, *id.*, at 546–548:

"Rh. I. was the only exception to a compliance with the recommendation from Annapolis [to have a Const. Convention], well known to have been swayed by an obdurate adherence to an advantage which her position gave her of taxing her neighbors thro' their consumption of imported supplies, an advantage which it was foreseen would be taken from her by a revisal of the Articles of Confederation.

.        .        .        .        .

"The same want of a general power over Com-

---

[3] Madison noted the States' aversion to the transfer of power to a central government "notwithstanding the urgent demands of the Federal Treasury; the glaring inadequacy of the authorized mode of supplying it, the rapid growth of anarchy in the Fedl. System, and the animosity kindled among its members by their conflicting regulations." 3 Farrand 544. See also, *e. g.*, 1 *id.*, at 19 (Mr. Randolph's comments concerning defects of Articles of Confederation); *id.*, at 462 (Mr. Ghorum, in explaining why small States should not object to the formation of the Union, notes: "Should a separation of the States take place, the fate of N. Jersey wd. be worst of all. She has no foreign commerce & can have but little. Pa. & N. York will continue to levy taxes on her consumption"); 3 *id.*, at 328–329 (Mr. Madison's remarks during debate at the Virginia Convention).

merce led to an exercise of this power separately, by the States, wch not only proved abortive, but engendered rival, conflicting and angry regulations. Besides the vain attempts to supply their respective treasuries by imposts, which turned their commerce into the neighbouring ports, and to co-erce a relaxation of the British monopoly of the W. Indn. navigation, which was attemted by Virga. . . . the States having ports for foreign commerce, taxed & irritated the adjoining States, trading thro' them, as N. Y. Pena. Virga. & S-Carolina."

The Framers of the Constitution thus sought to alleviate three main concerns by committing sole power to lay imposts and duties on imports in the Federal Government, with no concurrent state power: the Federal Government must speak with one voice when regulating commercial relations with foreign governments, and tariffs, which might affect foreign relations, could not be implemented by the States consistently with that exclusive power; [4] import revenues were to be the major source of revenue of the Federal Government and should not be diverted to the States; [5] and harmony among the States might be disturbed unless seaboard States, with their crucial ports of entry, were prohibited from levying taxes on citizens of other States by taxing goods merely

---

[4] See, *e. g., Brown* v. *Maryland,* 12 Wheat. 419, 439 (1827); *Cook* v. *Pennsylvania,* 97 U. S. 566, 574 (1878); *Youngstown Sheet & Tube Co.* v. *Bowers,* 358 U. S. 534, 555–556 (1959) (Frankfurter, J., dissenting); The Federalist Nos. 11 (Hamilton), 12 (Hamilton), 42 (Madison), 44 (Madison); 2 Farrand 135, 157–158, 169 (notes of Committee of Detail); *id.,* at 441; 3 *id.,* at 520–521 (letter of James Madison to Professor Davis); *id.,* at 547–548.

[5] See, *e. g., Brown* v. *Maryland, supra,* at 439; *Youngstown Sheet & Tube Co.* v. *Bowers, supra,* at 556 (Frankfurter, J., dissenting); The Federalist No. 12.

flowing through their ports to the other States not situated as favorably geographically.[6]

Nothing in the history of the Import-Export Clause even remotely suggests that a nondiscriminatory ad valorem property tax which is also imposed on imported goods that are no longer in import transit was the type of exaction that was regarded as objectionable by the Framers of the Constitution. For such an exaction, unlike discriminatory state taxation against imported goods as imports, was not regarded as an impediment that severely hampered commerce or constituted a form of tribute by seaboard States to the disadvantage of the other States.

It is obvious that such nondiscriminatory property taxation can have no impact whatsoever on the Federal Government's exclusive regulation of foreign commerce, probably the most important purpose of the Clause's prohibition. By definition, such a tax does not fall on imports as such because of their place of origin. It cannot be used to create special protective tariffs or particular preferences for certain domestic goods, and it cannot be applied selectively to encourage or discourage any importation in a manner inconsistent with federal regulation.

Nor will such taxation deprive the Federal Government of the exclusive right to all revenues from imposts and duties on imports and exports, since that right by definition only extends to revenues from exactions of a particular category; if nondiscriminatory ad valorem taxation is not in that category, it deprives the Federal

---

[6] See, e. g., Brown v. Maryland, supra, at 440; Cook v. Pennsylvania, supra, at 574; Youngstown Sheet & Tube Co. v. Bowers, supra, at 545; id., at 556–557 (Frankfurter, J., dissenting); 2 Farrand 441–442, 589; 3 id., at 519 (letter of James Madison to Professor Davis).

Government of nothing to which it is entitled. Unlike imposts and duties, which are essentially taxes on the commercial privilege of bringing goods into a country, such property taxes are taxes by which a State apportions the cost of such services as police and fire protection among the beneficiaries according to their respective wealth; there is no reason why an importer should not bear his share of these costs along with his competitors handling only domestic goods. The Import-Export Clause clearly prohibits state taxation based on the foreign origin of the imported goods, but it cannot be read to accord imported goods preferential treatment that permits escape from uniform taxes imposed without regard to foreign origin for services which the State supplies. See, *e. g., May* v. *New Orleans,* 178 U. S. 496, 502–504, 507–509 (1900). It may be that such taxation could diminish federal impost revenues to the extent its economic burden may discourage purchase or importation of foreign goods. The prevention or avoidance of this incidental effect was not, however, even remotely an objective of the Framers in enacting the prohibition. Certainly the Court in *Brown* did not think so. See 12 Wheat., at 443–444. Taxes imposed after an initial sale, after the breakup of the shipping packages, or the moment goods imported for use are committed to current operational needs are also all likely to have an incidental effect on the volume of goods imported; yet all are permissible. See, *e. g., Waring* v. *The Mayor,* 8 Wall. 110 (1869) (taxation after initial sale); *May* v. *New Orleans, supra* (taxation after breakup of shipping packages); *Youngstown Sheet & Tube Co.* v. *Bowers,* 358 U. S. 534 (1959) (taxation of goods committed to current operational needs by manufacturer). What those taxes and nondiscriminatory ad valorem property taxes share, it should be emphasized, is

the characteristic that they cannot be selectively imposed and increased so as substantially to impair or prohibit importation.[7]

Finally, nondiscriminatory ad valorem property taxes do not interfere with the free flow of imported goods among the States, as did the exactions by States under the Articles of Confederation directed solely at imported goods. Indeed, importers of goods destined for inland States can easily avoid even those taxes in today's world. Modern transportation methods such as air freight and containerized packaging, and the development of railroads and the Nation's internal waterways, enable importation directly into the inland States. Petitioner, for example, operates other distribution centers from wholesale warehouses in inland States. Actually, a quarter of the tires distributed from petitioner's Georgia warehouse are imported interstate directly from Canada. To be sure, allowance of nondiscriminatory ad valorem property taxation may increase the cost of goods purchased by "inland" consumers.[8] But as already noted,

---

[7] Of course, discriminatory taxation in such circumstances is not inconceivable. For example, a State could pass a law which only taxed the retail sale of imported goods, while the retail sale of domestic goods was not taxed. Such a tax, even though operating after an "initial sale" of the imports would, of course, be invalidated as a discriminatory imposition that was, in practical effect, an impost. Nothing in the opinion in *Brown* v. *Maryland* should suggest otherwise. The Court in *Brown* merely presumed that at these later stages of commercial activity, state impositions would not be discriminatory. But merely because *Brown* would have authorized a nondiscriminatory charge on even an importer's use of the services of a public auctioneer, see 12 Wheat., at 443, does not mean that it would have disapproved the holding of *Cook* v. *Pennsylvania*, 97 U. S. 566 (1878), which invalidated a tax on the sale of goods by auction that discriminated against foreign goods.

[8] Of course, depending on the relevant competition from domestic goods, an importer may be forced to absorb some of these ad valorem property assessments rather than passing them on to consumers.

such taxation is the *quid pro quo* for benefits actually conferred by the taxing State. There is no reason why local taxpayers should subsidize the services used by the importer; ultimate consumers should pay for such services as police and fire protection accorded the goods just as much as they should pay transportation costs associated with those goods.[9]   An evil to be prevented

---

[9] *Cooley* v. *Board of Wardens of Port of Philadelphia,* 12 How. 299 (1852), upheld pilotage fees imposed by the city of Philadelphia. It expressly rejected the argument that these fees were prohibited "imposts or duties," *id.,* at 314:

"[The Import-Export Clause] was intended to operate upon subjects actually existing and well understood when the constitution was formed. Imposts and duties on imports, exports, and tonnage were then known to the commerce of a civilized world to be as distinct from fees and charges for pilotage, and from the penalties by which commercial States enforced their pilot-laws, as they were from charges for wharfage or towage, or any other local port-charges for services rendered to vessels or cargoes; and to declare that such pilot-fees or penalties are embraced within the words imposts or duties on imports, exports, or tonnage, would be to confound things essentially different, and which must have been known to be actually different by those who used this language.  It cannot be denied that a tonnage duty, or an impost on imports or exports, may be levied under the name of pilot dues or penalties; and certainly it is the thing, and not the name, which is to be considered.  But, having previously stated that, in this instance, the law complained of does not pass the appropriate line which limits laws for the regulation of pilots and pilotage, the suggestion, that this law levies a duty on tonnage or on imports or exports, is not admissible; and, if so, it also follows, that this law is not repugnant to the first clause of the eighth section of the first article of the constitution, which declares that all duties, imposts, and excises shall be uniform throughout the United States; for, if it is not to be deemed a law levying a duty, impost, or excise, the want of uniformity throughout the United States is not objectionable.  Indeed, the necessity of conforming regulations of pilotage to the local peculiarities of each port, and the consequent impossibility of having its charges uniform throughout the United States, would be sufficient of itself to prove that they could not have been intended to be embraced within this clause of the constitution; for it cannot

by the Import-Export Clause was the levying of taxes which could only be imposed because of the peculiar geographical situation of certain States that enabled them to single out goods destined for other States. In effect, the Clause was fashioned to prevent the imposition of exactions which were no more than transit fees on the privilege of moving through a State.[10] A nondiscriminatory ad valorem property tax obviously stands on a different footing, and to the extent there is any conflict whatsoever with this purpose of the Clause, it may be secured merely by prohibiting the assessment of even nondiscriminatory property taxes on goods which are merely in transit through the State when the tax is assessed.[11]

Admittedly, the wording of the prohibition of the Import-Export Clause does not in terms except nondiscriminatory taxes with some impact on imports or exports. But just as clearly, the Clause is not written in terms of a broad prohibition of every "tax." The prohibition is only against States laying "Imposts or Duties" on "Imports." By contrast, Congress is empowered to "lay and collect Taxes, Duties, Imposts, and Excises," which plainly lends support to a reading of the Import-Export Clause as not prohibiting every exaction or "tax" which falls in some measure on imported goods. Indeed, Professor Crosskey makes a persuasive demon-

be supposed uniformity was required, when it must have been known to be impracticable."

Such fees, of course, would nevertheless likely increase the cost of the goods being imported. Thus more than a mere cost impact on imported goods is required before an exaction can be deemed to fall within the Clause's prohibition.

[10] See, e. g., License Cases, 5 How. 504, 575–576 (1847) (Taney, C. J.).

[11] Such an assessment would also be invalid under traditional Commerce Clause analysis.

stration that the words "imposts" and "duties" as used in 1787 had meanings well understood to be exactions upon imported goods as imports. "Imposts" were like customs duties, that is, charges levied on imports at the time and place of importation. "Duties" was a broader term embracing excises as well as customs duties, and probably only capitation, land, and general property exactions were known by the term "tax" rather than the term "duty." 1 W. Crosskey, Politics and the Constitution in the History of the United States 296–297 (1953).[12] The characteristic common to both "im-

---

[12] In 2 Farrand 305, the following is reported as having occurred during the debate on the last draft of the Tax Clause submitted by the Committee of Detail:

"Mr. L. Martin asked what was meant by the Committee of detail (in the expression) *'duties'* and *'imposts.'* If the meaning were the same, the former was unnecessary; if different, the matter ought to be made clear.

"Mr. Wilson, *duties* are applicable to many objects to which the word *imposts* does not relate. The latter are appropriated to commerce; the former extend to a variety of objects, as stamp duties &c."

Subsequently, Mr. Martin also stated in his "Genuine Information" delivered to the Maryland Legislature, see 3 Farrand 203–204:

"By the *eighth* section of this article, Congress is to have power to *lay* and *collect taxes, duties, imposts,* and *excises.* When we met in convention after our adjournment, to receive the report of the committee of detail, the members of that committee were requested to inform us, what powers were meant to be vested in Congress by the word *duties* in this section, since the word *imposts* extended to duties on goods *imported,* and by another part of the system no duties on *exports* were to be laid. In answer to this inquiry, we were informed, that it was meant to give the general government the power of laying *stamp* duties on paper, parchment, and vellum. . . . By the power to lay and collect imposts, they may impose duties on *any* or *every* article of *commerce* imported into these States, to what amount they please. By the power to lay *excises,* a power very *odious* in its nature, since it authorizes officers to go into your *houses,* your *kitchens,* your *cellars,* and to examine into your *private*

posts" and "duties" was that they were exactions directed at imports or commercial activity as such and, as imposed by the seaboard States under the Articles of Con-

*concerns,* the Congress may impose *duties* on every *article* of *use* or *consumption,*—on the *food* that we *eat,* on the *liquors* we *drink,* on the *clothes* that we *wear,* the *glass* which *enlightens* our *houses,* or the *hearths* necessary for our *warmth* and *comfort.* By the power to lay and collect taxes, they may proceed to *direct taxation* on *every individual,* either by a *capitation* tax on their *heads,* or an *assessment* on their *property.* By this part of the section therefore, the government has power to lay what duties they please on *goods imported;* to lay what duties they please, afterwards, on whatever we *use* or *consume;* to impose *stamp duties* to what amount they please, and in whatever case they please; afterwards to impose on the people *direct taxes,* by capitation tax, or by assessment, to what amount they choose . . . ."

A similar recognition that commercial "imposts" do not encompass property "taxes" appears in The Federalist No. 12, pp. 80–81, 84 (Bourne ed. 1947):

"It is evident from the state of the country, from the habits of the people, from the experience we have had on the point itself, that it is impracticable to raise any very considerable sums by direct taxation. Tax laws have in vain been multiplied; new methods to enforce the collection have in vain been tried; the public expectation has been uniformly disappointed, and the treasuries of the States have remained empty. The popular system of administration inherent in the nature of popular government, coinciding with the real scarcity of money incident to a languid and mutilated state of trade, has hitherto defeated every experiment for extensive collections, and has at length taught the different legislatures the folly of attempting them.

"No person acquainted with what happens in other countries will be surprised at this circumstance. In so opulent a nation as that of Britain, where direct taxes from superior wealth must be much more tolerable, and, from the vigor of the government, much more practicable, than in America, far the greatest part of the national revenue is derived from taxes of the indirect kind, from imposts, and from excises. Duties on imported articles form a large branch of this latter description.

"In America, it is evident that we must a long time depend for

federation, were purposefully employed to regulate interstate and foreign commerce and tax States situated less favorably geographically.

In any event, since prohibition of nondiscriminatory ad valorem property taxation would not further the objectives of the Import-Export Clause, only the clearest constitutional mandate should lead us to condemn such taxation. The terminology employed in the Clause— "Imposts or Duties"—is sufficiently ambiguous that we decline to presume it was intended to embrace taxation

---

the means of revenue chiefly on such duties. In most parts of it, excises must be confined within a narrow compass. The genius of the people will ill brook the inquisitive and peremptory spirit of excise laws. The pockets of the farmers, on the other hand, will reluctantly yield but scanty supplies, in the unwelcome shape of impositions on their houses and lands; and personal property is too precarious and invisible a fund to be laid hold of in any other way than by the imperceptible agency of taxes on consumption.

. . . . .

". . . A nation cannot long exist without revenues. Destitute of this essential support, it must resign its independence, and sink into the degraded condition of a province. This is an extremity to which no government will of choice accede. Revenue, therefore, must be had at all events. In this country, if the principal part be not drawn from commerce, it must fall with oppressive weight upon land. It has been already intimated that excises, in their true signification, are too little in unison with the feelings of the people, to admit of great use being made of that mode of taxation; nor, indeed, in the States where almost the sole employment is agriculture, are the objects proper for excise sufficiently numerous to permit very ample collections in that way. Personal estate (as has been before remarked), from ᐧthe difficulty in tracing it, cannot be subjected to large contributions, by any other means than by taxes on consumption."

See also, e. g., The Federalist Nos. 30, 32, 35, 36; T. Cooley, The General Principles of Constitutional Law in the United States c. V, § 3, c. VII, § 14 (Bruce ed. 1931); 2 J. Story, Commentaries on the Constitution of the United States §§ 946–950, 954, 1013–1014 (1833); n. 9, supra.

that does not create the evils the Clause was specifically intended to eliminate.

IV

The Court in *Low* v. *Austin* nevertheless expanded the prohibition of the Clause to include nondiscriminatory ad valorem property taxes, and did so with no analysis, but with only the statement that *Brown* v. *Maryland* had marked the line "where the power of Congress over the goods imported ends, and that of the State begins, with as much precision as the subject admits." 13 Wall., at 32. But the opinion in *Brown* v. *Maryland* cannot properly be read to propose such a broad definition of "imposts" or "duties." The tax there held to be prohibited by the Import-Export Clause was imposed under a Maryland statute that required importers of foreign goods, and wholesalers selling the same by bale or package, to obtain a license and pay a $50 fee therefor, subject to certain forfeitures and penalties for noncompliance. The importers contested the validity of the statute, arguing that the license was a "palpable evasion" of the Import-Export Clause because it was essentially equivalent to a duty on imports. They contended that asserted differences between the license fee and a tax directly imposed on imports were more formal than substantial: the privilege of bringing the goods into the country could not realistically be divorced from the privilege of selling the goods, since the power to prohibit sale would be the power to prohibit importation, 12 Wheat., at 422; the payment of the tax at the time of sale rather than at the time of importation would be irrelevant since it would still be a tax on the same privilege at either time, *id.*, at 423; and the fact that a license operates on the person of the importer while the duty operates on the goods themselves is irrelevant in that either levy would directly increase the cost of the goods, *ibid.* Since the

power to impose a license on importers would also entail a power to price them out of the market or prohibit them entirely, the importers concluded that such a power must be repugnant to the exclusive federal power to regulate foreign commerce, *id.*, at 423–425.

The Attorney General of Maryland, Roger Taney, later Chief Justice, defended the constitutionality of Maryland's law. He argued that the fee was not a prohibited "impost" or "duty" because the license fee was not a tax upon the imported goods, but on the importers, a tax upon the occupation and nothing more, and the Import-Export Clause prohibited only exactions on the right of importation and not an exaction upon the occupation of importers. He contended that, in any event, the Clause, if not read as prohibiting only exactions on the right of importation, but, more broadly, as also prohibiting exactions on goods imported, would necessarily immunize imports from all state taxation at any time. Moreover, if the privilege of selling is a concomitant of the privilege of importing, the argument proved too much; the importer could sell free of regulation by the States in any place and in any manner, even importing free of regulations concerning the bringing of noxious goods into the city, or auctioning the goods in public warehouses, or selling at retail or as a traveling peddler, activities that had traditionally been subject to state regulation and taxation.

The Court in *Brown* refused to define "imposts" or "duties" comprehensively, since the Maryland statute presented only the question "whether the legislature of a State can constitutionally require the importer of foreign articles to take out a license from the State, before he shall be permitted to sell a bale or package so imported." 12 Wheat., at 436. However, in holding that the Maryland license fee was within prohibited "im-

posts, or duties on imports . . ." the Court significantly
characterized an impost or duty as "a custom or a tax
levied on articles brought into a country," *id.*, at 437,
although also holding that, while normally levied before
the articles are permitted to enter, the exactions are no
less within the prohibition if levied upon the goods as
imports after entry; since "imports" are the goods im-
ported, the prohibition of imposts or duties on "imports"
was more than a prohibition of a tax on the act of impor-
tation; it "extends to a duty levied after [the thing
imported] has entered the country," *id.*, at 438. And
since the power to prohibit sale of an article is the power
to prohibit its introduction into the country, the privi-
lege of sale must be a concomitant of the privilege of
importation, and licenses on the right to sell must there-
fore also fall within the constitutional prohibition. *Id.*,
at 439.

Taney's argument was persuasive, however, to the
extent that the Court was prompted to declare that
"the words of the prohibition ought not to be pressed
to their utmost extent; . . . in our complex system, the
object of the powers conferred on the government of the
Union, and the nature of the often conflicting powers
which remain in the States, must always be taken into
view . . . . [T]here must be a point of time when the
prohibition ceases, and the power of the State to tax com-
mences . . . ." *Id.*, at 441.

The Court stated that there were two situations in
which the prohibition would not apply. One was the
case of a state tax levied after the imported goods had
lost their status as imports. The Court devised an
evidentiary tool, the "original package" test, for use in
making that determination. The formula was: "It is
sufficient for the present to say, generally, that when
the importer has so acted upon the thing imported,

that it has become incorporated and mixed up with the mass of property in the country, it has, perhaps, lost its distinctive character as an import, and has become subject to the taxing power of the State; but while remaining the property of the importer, in his warehouse, in the original form or package in which it was imported, a tax upon it is too plainly a duty on imports to escape the prohibition in the constitution." *Id.*, at 441–442. "It is a matter of hornbook knowledge that the original package statement of Justice Marshall was an illustration, rather than a formula, and that its application is evidentiary, and not substantive . . . ." *Galveston* v. *Mexican Petroleum Corp.*, 15 F. 2d 208 (SD Tex. 1926).

The other was the situation of particular significance to our decision of this case, that is, when the particular state exaction is not a prohibited "impost" or "duty." The Court first stated its view of the characteristics of prohibited state levies. It said that the obvious clue was the express exception of the Import-Export Clause authorizing "imposts or duties" that "may be absolutely necessary for executing [the State's] inspection Laws." "[T]his exception," said the Court, "in favour of duties for the support of inspection laws, goes far in proving that the framers of the constitution classed taxes of *a similar character* with those imposed for the purposes of inspection, with duties on imports and exports, and supposed them to be prohibited." 12 Wheat., at 438 (emphasis supplied). The characteristic of the prohibited levy, the Court said later in the opinon—illustrated by the Maryland license tax—was that "the tax intercepts the import, *as an import,* in its way to become incorporated with the general mass of property, and denies it the privilege of becoming so incorporated until it shall have contributed to the revenue of the State." *Id.*, at 443 (em-

phasis supplied). The Court illustrated the kinds of state exactions that in its view fell without the prohibition as examples of neutral and nondiscriminatory taxation: a tax on itinerant peddlers, a service charge for the use of a public auctioneer, a property tax on plate or furniture personally used by the importer. These could not be considered within the constitutional prohibition because they were imposed without regard to the origin of the goods taxed. *Id.,* at 443, 444. In contrast, the Maryland exaction in question was a license fee which singled out imports, and therefore was prohibited because "the tax intercepts the import, *as an import,* in its way to become incorporated with the general mass of property." *Id.,* at 443. (Emphasis supplied.)

Thus, it is clear that the Court's view in *Brown* was that merely because certain actions taken by the importer on his imported goods would so mingle them with the common property within the State as to "lose their distinctive character as imports" and render them subject to the taxing power of the State, did not mean that in the absence of such action, no exaction could be imposed on the goods. Rather, the Court clearly implied that the prohibition would not apply to a state tax that treated imported goods in their original packages no differently from the "common mass of property in the country"; that is, treated it in a manner that did not depend on the foreign origins of the goods.

Despite the language and objectives of the Import-Export Clause, and despite the limited nature of the holding in *Brown* v. *Maryland,* the Court in *Low* v. *Austin* ignored the warning that the boundary between the power of States to tax persons and property within their jurisdictions and the limitations on the power of the States to impose imposts or duties with respect to "imports" was a subtle and difficult line which

must be drawn as the cases arise. *Low* v. *Austin* also ignored the cautionary remark that, for those reasons, it "might be premature to state any rule as being universal in its application." 12 Wheat., at 441. Although it was "sufficient" in the context of Maryland's license tax on the right to sell imported goods to note that a tax imposed directly on imported goods which have not been acted upon in any way would clearly fall within the constitutional prohibition, that observation did not apply, as the foregoing analysis indicates, to a state tax which treated those same goods without regard to the fact of their foreign origin.

*Low* v. *Austin* compounded the error in misreading the *Brown* opinion by the further error of misreading the views of Mr. Chief Justice Taney as expressed in his opinion in the *License Cases,* 5 How. 504 (1847) (six Justices wrote separately in the cases). As already observed, when the Chief Justice was Attorney General of Maryland he argued *Brown* v. *Maryland* for the State. He had argued that the Maryland license fee requirement fell upon the importer, not the imported goods, and therefore fell without the Import-Export Clause's prohibition against imposts or duties on "imports." In the *License Cases* he observed that "further and more mature reflection has convinced me that the rule laid down [in *Brown* v. *Maryland*] is a just and safe one, and perhaps the best that could have been adopted for preserving the right of the United States on the one hand, and of the States on the other, and preventing collision between them. The question, I have already said, was a very difficult one for the judicial mind. In the nature of things, the line of division is in some degree vague and indefinite, and I do not see how it could be drawn more accurately and correctly, or more in harmony with the obvious intention and object of this provision in the

constitution. Indeed, goods imported, while they remain in the hands of the importer, in the form and shape in which they were brought into the country, can in no just sense be regarded as a part of that mass of property in the State usually taxed for the support of the State government." 5 How., at 575.

*Low* v. *Austin* quoted this excerpt, 13 Wall., at 33–34, as supporting the holding, *id.*, at 34, that "a tax upon [imported goods], in any shape, is within the constitutional prohibition." But Mr. Chief Justice Taney said much more in his opinion in the *License Cases*, and what he said further makes crystal clear that the prohibition applied only to state exactions upon imports *as imports* and did not apply to nondiscriminatory ad valorem property taxes. For, continuing his analysis in the very paragraph from which *Low* v. *Austin* excerpted only a part, he concluded: "A tax in any shape . . . cannot be done directly, in the shape of a *duty on imports,* for that is expressly prohibited. And as it cannot be done directly, it could hardly be a just and sound construction of the constitution which would enable a State to accomplish precisely the same thing under another name, and in a different form." 5 How., at 576 (emphasis supplied). The Chief Justice then went on to distinguish an exaction upon imports *as imports* from property taxes indiscriminately applied to all owners of property, stating, *ibid.:*

> "Undoubtedly a State may impose a tax upon its citizens in proportion to the amount they are respectively worth; *and the importing merchant is liable to this assessment like any other citizen, and is chargeable according to the amount of his property, whether it consists of money engaged in trade, or of imported goods which he proposes to sell,* or any other property of which he is the owner.

But a tax of this description stands upon a very different footing from a tax on the thing imported, while it remains a part of foreign commerce, and is not introduced into the general mass of property in the State." (Emphasis supplied.)

Thus Mr. Chief Justice Taney's opinion is authority, precisely contrary to the reading of *Low* v. *Austin*, that nondiscriminatory ad valorem property taxes are not prohibited by the Import-Export Clause.

It follows from the foregoing that *Low* v. *Austin* was wrongly decided. That decision therefore must be, and is, overruled.[13]

---

[13] In another context, this Court said that "[i]n view of the fact that the Constitution gives Congress authority to consent to state taxation of imports and hence to lay down its own test for determining when the immunity ends, we see no convincing practical reason for abandoning the test which has been applied for more than a century . . . ." *Hooven & Allison Co.* v. *Evatt*, 324 U. S. 652, 668 (1945). However, this overlooked the fact that the Import-Export Clause contains a provision that "the net Produce of all Duties and Imposts, laid by any State on Imports or Exports, shall be for the Use of the Treasury of the United States . . . ." Although the Constitutional Convention had refused to make the Import-Export Clause's prohibition of state exactions absolute, it immediately added that proviso, which Mr. Madison supported "as preventing all State imposts." 2 Farrand 441–442. See also, e. g., 3 *id.*, at 215–216 (Luther Martin's "Genuine Information"). Of course, Congress presumably could enact other legislation transferring the funds back to the States after they were put to "the Use of the Treasury of the United States." But may Congress consent to state exactions if they are not uniform throughout the United States, since any congressional taxation must conform to the mandate of Art. I, § 8, cl. 1, that "all Duties, Imposts, and Excises shall be uniform throughout the United States"? If Congress may authorize, under the Import-Export Clause, an exaction that it could not directly impose under the Tax Clause, would that not permit Congress to undermine the policies which both Clauses were fashioned to secure? Since, however, we hold that *Low* v. *Austin*

## V

Petitioner's tires in this case were no longer in transit. They were stored in a distribution warehouse from which petitioner conducted a wholesale operation, taking orders from franchised dealers and filling them from a constantly replenished inventory. The warehouse was operated no differently than would be a distribution warehouse utilized by a wholesaler dealing solely in domestic goods, and we therefore hold that the non-discriminatory property tax levied on petitioner's inventory of imported tires was not interdicted by the Import-Export Clause of the Constitution. The judgment of the Supreme Court of Georgia is accordingly

*Affirmed.*

MR. JUSTICE STEVENS took no part in the consideration or decision of this case.

MR. JUSTICE WHITE, concurring in the judgment.

Being of the view that the goods involved here had lost their character as imports and that subjecting them to ad valorem taxation was consistent with the Constitution as interpreted by prior cases, including *Low* v. *Austin*, 13 Wall. 29 (1872), I would affirm the judgment. There is little reason and no necessity at this time to overrule *Low* v. *Austin*. None of the parties has challenged that case here, and the issue of its overruling has not been briefed or argued.

---

was not properly decided, there is no occasion to address the question whether Congress could have constitutionally consented to state nondiscriminatory ad valorem property taxes if they had been within the prohibition of the Import-Export Clause.