IN THE MATTER OF: THE APPEAL OF R. J. REYNOLDS TOBACCO COM-
PANY FROM THE DENIALS OF ITS CLAIMS FOR EXEMPTION BY DUR-
HAM COUNTY AND FORSYTH COUNTY FOR 1983

No. 8410PTC481

(Filed 19 March 1985)

1. Taxation § 9.1— ad valorem taxes—imported tobacco in customs bonded ware-
houses—no violation of Import-Export clause

  The imposition of a nondiscriminatory ad valorem tax on imported tobacco
stored in United States customs bonded warehouses located in Durham and
Forsyth Counties is not prohibited by the Import-Export clause, Art. I, § 10,
cl. 2, of the U. S. Constitution.

2. Taxation § 9.1— ad valorem taxes—imported tobacco in customs bonded ware-
houses—no undue burden on foreign commerce—no federal preemption

  The imposition of a nondiscriminatory ad valorem tax on imported tobacco
stored in customs bonded warehouses for domestic use does not place an un-
due burden on foreign commerce in violation of Art. I, § 8, cl. 3, of the U. S.
Constitution. Nor has State property taxation of such tobacco been preempted
by federal regulation. Art. VI, cl. 2 of the U. S. Constitution.

3. Taxation § 9.1— ad valorem taxes—imported tobacco in customs bonded ware-
houses—no violation of due process

  The imposition of ad valorem taxes on imported tobacco stored in customs
bonded warehouses in Durham and Forsyth Counties does not violate the Due
Process Clause of the U. S. Constitution since such tobacco receives the same
fire and police protection and other services by Durham and Forsyth Counties
as domestic tobacco.

4. Taxation § 25.10— appeal to Property Tax Commission—notice of appeal
naming wrong person as clerk

  The Property Tax Commission was not precluded from exercising jurisdic-
tion in an appeal from the Durham County Board of Equalization and Review
because appellant's notice of appeal sent to the Clerk of the Board of County
Commissioners named the wrong person as Clerk where the notice was re-
ceived by Durham County and the County was not prejudiced by failure of the
notice to name the right person.

APPEAL by R. J. Reynolds Tobacco Company from Final Deci-
sion of the Property Tax Commission entered 14 December 1983.
Heard in the Court of Appeals 9 January 1985.

*Horton, Hendrick & Kummer by Thomas L. Kummer and
John A. Cocklereece, Jr., for R. J. Reynolds Tobacco Company,
appellant.*

*Assistant County Attorney S. C. Kitchen for County of Dur-
ham, appellee.*

*P. Eugene Price, Jr., and Jonathan V. Maxwell for Forsyth County and its Affected Municipalities; and John G. Wolfe, III, for Town of Kernersville, appellees.*

*Assistant City Attorney Henry D. Blinder for City of Durham, Amicus Curiae.*

COZORT, Judge.

R. J. Reynolds Tobacco Company appeals from an adverse decision of the Property Tax Commission. Reynolds had argued to the Commission that imported tobacco owned by Reynolds and stored in the United States customs bonded warehouses located in Durham and Forsyth Counties was excluded from ad valorem taxation. The Commission disagreed and denied Reynolds' claims for a property tax exemption. We affirm.

The basic facts are undisputed. R. J. Reynolds Tobacco Company is a New Jersey corporation qualified to do business in North Carolina with its principal offices in Winston-Salem. Reynolds manufactures in Forsyth County finished tobacco products which it sells to wholesale distributors and other authorized purchasers in the United States and abroad. Reynolds uses tobacco grown in the United States and in foreign countries in the manufacture of its tobacco products. In May and June of 1983, Reynolds appeared before the Durham County and the Forsyth County Boards of Equalization and Review, seeking a property tax exemption for imported leaf tobacco stored in customs bonded warehouses located in each county. The total tax involved is over seven million dollars for 1983.

The allegedly "exempt" tobacco had been imported from Bulgaria, Syria, Turkey, Lebanon, and Brazil. The tobacco is shipped by bonded carrier to the United States and unloaded from the carrier at a port of entry where it is placed under customs bond. A "customs bond" is a bond given by the importer at the time the tobacco is physically imported into the United States for the purpose of securing the payment of federal import duties. The tobacco is then transported by rail or truck to a storage facility where it remains under customs bond until it is withdrawn from storage.

The storage facilities used by Reynolds to hold its imported tobacco are United States customs bonded warehouses. The cus-

toms bonded warehouses and the land on which they are situated in Durham and Forsyth Counties are owned by Reynolds which is the sole user of the warehouses. The warehouses themselves and the land underlying them are subject to property taxation in both counties. In all, Reynolds has twenty-six customs bonded warehouses in Durham County and sixty-two customs bonded warehouses in Forsyth County. Imported tobacco is normally held in storage by Reynolds for two years before it is withdrawn and blended with domestically grown tobacco in the manufacturing process. When the imported tobacco is withdrawn from bonded storage for manufacturing, customs duties are paid by Reynolds to the federal government.

Virtually all the imported tobacco stored in these customs bonded warehouses in Durham and Forsyth Counties is used by Reynolds for the domestic manufacture of finished tobacco products. Furthermore, virtually all the tobacco products manufactured by Reynolds from imported tobacco are sold and consumed in the United States.

From the denial of its claims for property tax exemption by the Durham and Forsyth Counties Boards of Equalization and Review, Reynolds appealed to the Property Tax Commission. Prior to a hearing on the matter, Durham County filed a motion to dismiss the appeal from that County's Board on the ground that Reynolds had failed to properly perfect its appeal to the Commission. The denial of this motion is the subject of Durham County's cross-assignment of error.

The Property Tax Commission held that the Durham and Forsyth Counties Boards of Equalization and Review correctly denied Reynolds' claims for exemption from property taxation of imported tobacco stored as of 1 January 1983 in customs bonded warehouses.

I.

The scope of our review on appeal from a decision of the Property Tax Commission is governed by G.S. 105-345.2. *See In re McElwee*, 304 N.C. 68, 283 S.E. 2d 115 (1981). Section (b) of this statute lists six grounds on which an appellate court may reverse, remand, modify, or declare null and void the findings, inferences,

conclusions, or decisions made by the Commission. Although in the record Reynolds has taken other exceptions, for example, to certain findings of fact, it has failed to bring them forward in its brief. Instead, Reynolds has couched its entire appeal on the ground set forth in G.S. 105-345.2(b)(1) that the Commission's conclusions of law are in "violation of constitutional provisions." Basing its argument on three constitutional grounds, Reynolds argues that imposing ad valorem property taxes on imported tobacco stored in United States customs bonded warehouses is unconstitutional. Our review of Reynolds' appeal is confined to this issue.

First, we briefly explain the concept of and purpose behind customs bonded warehouses. In order to encourage merchants here and abroad to use American ports, Congress was willing to waive all duty on goods that were reexported and to defer for a prescribed period the duty on imported goods destined for domestic consumption. *See* 19 U.S.C.A. 1557(a). To carry out this objective, Congress, pursuant to its powers under the Commerce clause, established a comprehensive customs system which created secure and duty-free enclaves or government-supervised bonded warehouses. For a five-year period, imported goods may be stored in the warehouses duty-free. If during this period the goods are withdrawn and reexported, no duty is paid. If the goods are withdrawn for American consumption or stored beyond five years, any duty owed on the goods becomes due. *Xerox Corp. v. County of Harris*, 459 U.S. 145, 103 S.Ct. 523, 74 L.Ed. 2d 323 (1982).

At the outset, we note three cases which guide our determination of the issue presented: *Michelin Tire Corp. v. Wages*, 423 U.S. 276, 96 S.Ct. 535, 46 L.Ed. 2d 495, *rehearing denied*, 424 U.S. 935, 96 S.Ct. 1151, 47 L.Ed. 2d 344 (1976); *Xerox v. County of Harris, supra*; and *American Smelting and Refining Co. v. County of Contra Costa*, 271 Cal. App. 2d 437, 77 Cal. Rptr. 570 (1969), *appeal dismissed for want of substantial federal question*, 396 U.S. 273, 90 S.Ct. 553, 24 L.Ed. 2d 462 (1970).

A.

[1] The first ground asserted by Reynolds as a basis for holding unconstitutional the imposition of ad valorem taxes on its im-

ported tobacco in Durham and Forsyth Counties is the Import-Export clause. Article I, § 10, clause 2 of the United States Constitution provides in part that "[n]o state shall, without the consent of congress, lay any imposts or duties on imports or exports." Reynolds maintains that the tobacco involved in this case is still in the import stream of commerce. It argues that because Congress has decided that goods can remain in customs bonded warehouses duty-free for five years, Congress has thereby defined the period during which goods remain in foreign commerce.

This argument is without merit. In *Michelin Tire Corp. v. Wages, supra,* county tax officials assessed Georgia ad valorem property taxes against imported tires and tubes which were included in the corporation's inventory maintained at its wholesale distribution warehouse located in the county. The U.S. Supreme Court held that Georgia's assessment of a nondiscriminatory ad valorem property tax against imported goods that were no longer in import transit did not violate the Import-Export clause, regardless of whether the goods had lost their status as imports by being mingled with other goods of the importer. *Id.* at 279, 96 S.Ct. at 538, 46 L.Ed. 2d at 499-500. This decision expressly overruled *Low v. Austin,* 13 Wall 29, 20 L.Ed. 517 (1872), which had held that the states were prohibited by the Import-Export clause from imposing a nondiscriminatory ad valorem property tax on imported goods until they have lost their character as imports and have become incorporated into the mass of property in the state. *Id.* at 279, 282, 96 S.Ct. at 538, 539, 46 L.Ed. 2d at 500, 501. The *Michelin* decision indicates that "a state or local tax on imported goods is permissible if the goods have lost their status as imports, and that such a tax is also permissible, even if the goods have not lost their status as imports, if the tax is nondiscriminatory." Annot., 46 L.Ed. 2d 955, 967 (1977). The focus of Import-Export clause cases has therefore been changed "from the nature of the goods as imports to the nature of the tax at issue." *Limbach v. Hooven & Allison Co.,* --- U.S. ---, 104 S.Ct. 1837, 1842, 80 L.Ed. 2d 356, 363 (1984). It is unnecessary for this Court to determine whether the imported tobacco involved in this case was "still in the import stream of commerce." Neither party disputes the fact that the property taxes levied by Durham and Forsyth Counties are nondiscriminatory. We hold that the imposition of a nondiscriminatory ad valorem property tax on Reynolds'

imported tobacco located in customs bonded warehouses in Durham and Forsyth Counties is not prohibited by the Import-Export clause of the U.S. Constitution.

Two companion cases, *Youngstown Sheet & Tube Co. v. Bowers and United States Plywood Corp. v. City of Algoma*, 358 U.S. 534, 79 S.Ct. 383, 3 L.Ed. 2d 490 (1959), which did not have the benefit of the *Michelin* rule, saw no justification in allowing imported goods to escape a nondiscriminatory property tax. In *Youngstown*, iron ores were imported from five countries for use along with domestic ores in manufacturing at Youngstown's Ohio plant. United States Plywood imported lumber and veneers for use as needed along with domestic wood in its manufacturing processes. The imported lumber was "green" when received and therefore had to be dried before it could be used. These facts are similar to the undisputed facts in the case *sub judice*. Some of the tobacco imported by Reynolds must be held in storage for aging purposes before it can be used in manufacturing. The remaining imported tobacco has already been aged and is ready to be blended with domestically grown tobacco in the manufacturing operations of Reynolds in Winston-Salem. The Supreme Court concluded with regard to both *Youngstown* and *United States Plywood* as follows:

The materials here in question were imported to supply, and were essential to supply, the manufacturer's current operating needs. When . . . they were put to that use and indiscriminate portions of the whole were actually being used to supply daily operating needs, they stood in the same relation to the State as like piles of domestic materials . . . that were kept for use and used in the same way. The one was then as fully subject to taxation as the other. In those circumstances, the tax was not on "imports," nor was it a tax on the materials because they had been imported, but because at the time of the assessment they were being used, in every practical sense, for the purposes for which they had been imported. They were therefore subject to taxation just like domestic property that was kept . . . in the same way for the same use. We cannot impute to the Framers of the Constitution a purpose to make such a discrimination in favor of materials imported from other countries as would result if we approved the views pressed upon us by the manufacturers.

*Id.* at 549-50, 79 S.Ct. at 392, 3 L.Ed. 2d at 500-01.

Furthermore, in *In re Publishing Co.*, 281 N.C. 210, 188 S.E. 2d 310 (1972), the North Carolina Supreme Court similarly held that imported newsprint which was kept on hand for use in connection with the taxpayer's printing operation was subject to property taxation by Buncombe County in the same manner as the domestic newsprint which was kept at the same place, in the same manner, and for the same use. Our Supreme Court concluded that the Import-Export clause did not prohibit the assessment of a nondiscriminatory ad valorem tax on imported newsprint held for use in the taxpayer's manufacturing process. We likewise hold that even though the imported tobacco involved in this case is held in customs bonded warehouses the Import-Export clause confers no immunity to it from nondiscriminatory ad valorem property taxes.

B.

[2] A second argument proposed by Reynolds is that its imported tobacco is exempt from ad valorem property taxation under the Foreign Commerce clause and the Supremacy clause of the United States Constitution.

Article I, § 8, clause 3 of the United States Constitution states that Congress shall have the power "[t]o regulate commerce with foreign nations." Before a state tax can be declared unconstitutional, it must be shown to burden the interstate or foreign commerce involved. *See Halliburton Oil Well Cementing Co. v. Reily*, 373 U.S. 64, 83 S.Ct. 1201, 10 L.Ed. 2d 202, *rehearing denied*, 374 U.S. 858, 83 S.Ct. 1861, 10 L.Ed. 2d 1082 (1963). Not every burden is prohibited however, only those which discriminate against the commerce. *McGoldrick v. Berwind-White Coal Mining Co.*, 309 U.S. 33, 60 S.Ct. 388, 84 L.Ed. 565 (1940). *See generally, Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed. 2d 326, *rehearing denied*, 430 U.S. 976, 97 S.Ct. 1669, 52 L.Ed. 2d 3711 (1977). As will be seen, because Reynolds' imported tobacco is not forced to bear a heavier tax burden than its domestic tobacco, local ad valorem property taxation is not a discriminatory or an undue burden on foreign commerce.

The Supremacy clause, Article VI, clause 2 provides that the "[C]onstitution, and the laws of the United States which . . . shall be the supreme law of the land . . . any thing in the [C]onstitution or laws of any state to the contrary notwithstanding."

Essentially, Reynolds' argument with regard to these two clauses is that federal regulation has been so pervasive in this field that it has preempted state action. In *Silkwood v. Kerr-McGee Corp.*, --- U.S. ---, 104 S.Ct. 615, 78 L.Ed. 2d 443, *rehearing denied*, --- U.S. ---, 104 S.Ct. 1430, 79 L.Ed. 2d 754 (1984), the U. S. Supreme Court explained that state law can be preempted in two ways. First, if Congress evidences an intent to occupy a field, any state law falling within that field is preempted. Secondly, if Congress has not entirely displaced state regulation over the matter, state law is still preempted to the extent it actually conflicts with federal law or hinders the accomplishment of the objectives of Congress. *Id.* at ---, 104 S.Ct. at 621, 78 L.Ed. 2d at 452.

In *Xerox Corp. v. County of Harris, supra*, the United States Supreme Court was confronted with the question of whether a state may impose nondiscriminatory ad valorem property taxes on imported goods destined for foreign markets stored under bond in a customs warehouse. Xerox imported and stored copiers previously assembled in Mexico in customs bonded warehouses in Texas. The copiers were not designed or intended for domestic use. All of the copiers were ultimately sold abroad, allowing Xerox to avoid paying any import duties pursuant to 19 U.S.C. § 1557(a).

In determining whether Congress had evidenced an intent to preempt state action in this area, the Supreme Court examined the legislative history and congressional purpose behind the bonded warehousing system. A forerunner of the present statute, 19 U.S.C. § 1557(a), was the Warehousing Act of 1846, 9 Stat. 53. Its objective was to help establish the United States as a center of world commerce. According to the Supreme Court, "[t]he Act stimulated foreign commerce by allowing goods in transit in foreign commerce to remain in secure storage, duty free, *until they resumed their journey in export.*" *Id.* at 150, 103 S.Ct. at 526, 74 L.Ed. 2d at 328. (Emphasis added.) Accordingly, the Supreme Court held that state property taxes on goods awaiting export

stored under bond in a customs warehouse are preempted by Congress's comprehensive regulation of customs duties. The Court reasoned that it would be incompatible with the comprehensive scheme Congress enacted if the states were free to tax such goods while they were lodged temporarily in government-regulated bonded storage in this country.

However, *Xerox* is distinguishable from the case *sub judice* in one crucial respect. It is undisputed by the parties on appeal that virtually all the imported tobacco involved in this case is destined for domestic, rather than foreign, manufacture and consumption. Thus, we are faced with a different question than the U. S. Supreme Court faced in *Xerox*. While the imposition of ad valorem taxes on imported goods stored temporarily in this country prior to reexportation would make the United States a less attractive storage center and in turn contravene congressional objectives, we fail to see how the imposition of property taxes on goods not intended to be reexported would be inconsistent with the central purposes behind the establishment of customs bonded warehouses.

A case which addressed the preemption question in relation to facts similar to the present case was *American Smelting and Refining Co. v. County of Contra Costa, supra*. In *American Smelting*, a California county levied nondiscriminatory property taxes on imported metals stored in customs bonded warehouses for eventual domestic use. The California Court of Appeals sustained the validity of the property tax on the metals held for future domestic use. In a very thorough opinion, the *American Smelting* court reasoned that the "mere incident of the time of payment of the federal duty, as controlled by the taxpayer, does not appear to be a rational criteria upon which to predicate the determination of the local government's right to tax." *Id*. at 469, 77 Cal. Rptr. at 593-94. It further stated that the law and regulations governing customs bonded warehouses do not compel the conclusion that Congress in the exercise of its power to regulate foreign commerce meant to create a warehouse enclave for foreign goods subsequently sold and consumed in domestic commerce. "All that appears is an intent to relieve the processor of the obligation to pay the duty until the refined product is actually consumed or sold in domestic commerce, and the intent to relieve

him of the obligation to pay any duty if the refined product is exported." *Id.* at 470, 77 Cal. Rptr. at 594.

We agree and, like the *American Smelting* court, can find no "congressional intent [in the customs bonded warehouse scheme of legislation] to interfere with the right of the state to tax goods which have been imported for, and have been appropriated to, processing for domestic consumption, and that such right is not foreclosed because the importer-processor has withheld payment of the duty and has given a bond to secure such payment." *Id.* at 481, 77 Cal. Rptr. at 601.

Moreover, both imported and domestic tobacco generally require aging before manufacture. To exempt imported tobacco aging in customs bonded warehouses from property taxation while imposing these taxes on domestically grown tobacco aging in ordinary warehouses would be unfair. As the *American Smelting* court observed:

> [I]t would amount to a bounty to the operator of the tideland smelter processing metal-bearing materials of foreign origin which are destined for domestic consumption, and a discrimination against operators of domestic smelters refining domestic ores which are subject to local taxation.

*Id.* at 474, 77 Cal. Rptr. at 596-97. Also, since this imported tobacco receives the same local governmental services, such as police and fire protection, as domestic tobacco, local taxpayers would be forced to provide a subsidy in excess of a million dollars to Reynolds for its imported tobacco if exempted from property taxation. The U. S. Supreme Court in *Michelin, supra,* at 289, 96 S.Ct. at 542, 46 L.Ed. 2d at 505, recognized this problem and determined that local property "taxation is the *quid pro quo* for benefits actually conferred by the taxing State. There is no reason why local taxpayers should subsidize the services used by the importer."

Therefore, we must affirm the Property Tax Commission's conclusion that nondiscriminatory ad valorem personal property taxes on imported goods stored under bond in a customs warehouse but not destined for foreign markets are not prohibited. Since such taxation is not inconsistent with *Xerox* or with the purposes behind Congress's comprehensive legislative scheme in-

volving customs bonded warehouses, we hold State property taxation of this tobacco has not been preempted by federal regulation. Also, because this taxation is not a discriminatory burden on commerce, we hold it is similarly not prohibited by the Commerce clause.

C.

[3] As its final constitutional argument against the imposition of ad valorem property taxes on its imported tobacco, Reynolds asserts that due process prohibits state taxation of property which is not within the State's jurisdiction. Reynolds contends that even though its imported tobacco may be physically located in Durham and Forsyth Counties, this tobacco is not subject to the State's jurisdiction until it is withdrawn from the customs bonded warehouse and removed from the control of customs officials.

Ad valorem property taxation is governed by The Machinery Act, G.S. 105-271, *et seq.* G.S. 105-274 provides that all property—real and personal—within the jurisdiction of this State, whether owned by a foreign or domestic corporation is subject to taxation unless specifically excluded or exempted. Under *Xerox, supra,* imported goods destined for foreign markets stored temporarily in customs bonded warehouses have been excluded from local property taxation. As the above discussion reveals, imported goods destined for domestic consumption are not exempt from local property taxation. Also, our research has revealed no North Carolina law excluding the tobacco now in question from taxation. As stated in *Transfer Corp. v. County of Davidson,* 276 N.C. 19, 24-25, 170 S.E. 2d 873, 878 (1969):

> The test of whether a tax law violates due process is "whether the taxing power exerted by the state bears fiscal relation to protection, opportunities and benefits given by the state. The simple but controlling question is whether the state has given anything for which it can ask return." *Wisconsin v. J. C. Penney Co.,* 311 U.S. 435, 85 L.Ed. 267, 61 S.Ct. 246, 130 A.L.R. 1229 (1940).

It is undisputed in this case that the imported tobacco stored in Reynolds' customs bonded warehouses receives fire and police protection and other services by Durham and Forsyth Counties.

Therefore, under a Due Process clause analysis, Reynolds' imported tobacco is subject to property taxation just like its domestic tobacco receiving the same services.

Also, even though Reynolds is technically a New Jersey corporation, its tobacco physically located in this State is subject to North Carolina taxation. In *In re Plushbottom and Peabody*, 51 N.C. App. 285, 289, 276 S.E. 2d 505, 508, *disc. rev. denied*, 303 N.C. 314, 281 S.E. 2d 653 (1981), this Court noted that although the situs of personal property for purposes of taxation is ordinarily the domicile of the owner, when

> the owner maintains said property in a jurisdiction other than that of his domicile, in the conduct of his business within such jurisdiction, the *situs* of said property for purposes of taxation is its actual *situs*, and not that of its domicile. [Citation omitted.]

The "actual situs" of the imported tobacco in question in this case is its physical location in Durham and Forsyth Counties. It is clear that a local government may tax goods, not otherwise exempted, which are receiving local services and which are physically present within the State. We hold that the imposition of ad valorem property taxes on Reynolds' imported tobacco does not violate the Due Process clause of the U. S. Constitution.

In conclusion, we hold, as reflected by the above discussions, that the imposition of ad valorem property taxes on Reynolds' imported tobacco stored in its Durham and Forsyth Counties customs bonded warehouses is constitutional under the Import-Export clause, Commerce clause, Supremacy clause, and Due Process clause of the U.S. 'Constitution.

II.

[4] We also note that Durham County cross-assigned as error the Property Tax Commission's denial of its motion to dismiss Reynolds' appeal on the ground that Reynolds failed to comply with G.S. 105-324. This statute specifies that to perfect its appeal, the appellant must file a notice of appeal with the Clerk of the Board of County Commissioners and with the Property Tax Commission. In the present case, Reynolds mailed its notice to S. Bruce Mangum as Clerk of the Board of County Commissioners

instead of Edmund Slade Swindell, Jr., who was in fact the Board of County Commissioners' Clerk.

We hold the Property Tax Commission properly denied Durham County's motion to dismiss. The record reveals that Reynolds properly filed its notice with the Commission. It also mailed the notice to the Durham County attorney, the Durham County Tax Supervisor, and to Mr. S. Bruce Mangum, Clerk to the Durham County Board of Commissioners, Room 206, County Judicial Building, Durham, North Carolina 27701. This notice was received by Durham County. The failure to name the proper person as Clerk of the Board of County Commissioners was a misnomer and did not preclude the Property Tax Commission from exercising jurisdiction over the matter. Also, according to the Commission, Durham County conceded that it had not been prejudiced by Reynolds' failure to directly mail a copy to Edmund Slade Swindell, Jr. We likewise fail to see how Durham County might have been prejudiced. For these reasons and those given by the Commission in its final decision, we affirm the denial of Durham County's motion to dismiss.

The decision of the Property Tax Commission in all respects is

Affirmed.

Judges ARNOLD and EAGLES concur.