**COREX CORPORATION, d/b/a Quick Corporation of America, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. No. 72–1272–AAH.**

United States District Court, C. D. California.

July 26, 1978.

Bernard B. Laven, Los Angeles, Cal., for plaintiff.

William D. Keller, U. S. Atty., Charles H. Magnuson, Asst. U. S. Atty., Chief, Tax Div., and Arthur M. Greenwald, Asst. U. S. Atty., Los Angeles, Cal., for defendant, United States of America.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

HAUK, District Judge.

This action came on for trial on May 15, 16, 17 and 18, 1973, before this Court without a jury; Bernard B. Laven representing the Plaintiff, and the Defendant, United States of America, was represented by William D. Keller, United States Attorney, Charles Magnuson, Assistant United States Attorney, Chief, Tax Division, and Arthur M. Greenwald, Assistant United States Attorney, and the Court having examined the pleadings, admissions, stipulations, exhibits, memoranda, briefs on file, heard the evidence, and after full consideration of the matter made findings of fact and conclusions of law and ordered Judgment in favor of Plaintiff.

A Notice of Appeal was filed on behalf of the Defendant, United States of America. Thereafter on October 7, 1976, the Court of Appeals for the Ninth Circuit reversed the Judgment in favor of the United States of America.

After various Petitions to the Court of Appeals for the Ninth Circuit, the Plaintiff, on or about November 10, 1976, filed a Motion for an Order under Federal Rules of Civil Procedure, Rule 60(b)(6), to set aside Judgment and present new evidence which came into existence after the trial of this cause, supported by Affidavits, Exhibits, and Points and Authorities. On February

14, 1977, the Court of Appeals for the Ninth Circuit denied the Request on Behalf of District Court to Court of Appeals For Leave to Hear the Motion to Vacate Judgment for Remand, stating: "There is no need to remand the case to enable the District to hear proper motions before it."

On July 20, 1977, this Court, pursuant to the authority vested in it under Federal Rules of Civil Procedure, Rule 60(b)(6), having examined the pleadings, affidavits, and exhibits attached thereto; having heard and considered the arguments and Points and Authorities, made and presented by counsel, having otherwise considered the matter, this Court made an Order granting Plaintiff's Motion To Set Aside The Judgment heretofore entered in favor of Defendant and Present New Evidence, which Order was entered on July 21, 1977.

On or about July 28, 1977, Defendant, United States of America, filed an Application to the Court of Appeals for the Ninth Circuit, for leave pursuant to 28 U.S.C. § 1292(b) to prosecute an Interlocutory Appeal from the Order of this Court granting a new trial to Plaintiff.

On October 11, 1977, the Court of Appeals for the Ninth Circuit ruled: "Upon due consideration the Application For Leave to Appeal pursuant to 28 U.S.C. is denied."

The new trial of this action having been tried by the Court without a jury, Bernard B. Laven, representing the Plaintiff, and the Defendant, United States of America, represented by Andrea S. Ordin, United States Attorney, Charles H. Magnuson, Assistant United States Attorney, Chief, Tax Division, and Arthur M. Greenwald, Assistant United States Attorney; and the Court having examined the pleadings, admissions, stipulations, exhibits, memoranda, and briefs on file, heard the evidence, and having otherwise considered the matter in depth, the Court hereby makes the following findings of fact and conclusions of law:

## FINDINGS OF FACT

1. The Plaintiff at all times relevant was a resident of Orange County, State of California, and the Central District of California, and was conducting a wholesale fishing equipment distribution business in the United States under the name and style of Corex Corporation dba Quick Corporation of America.

2. That Defendant, United States of America, is a sovereign body politic.

3. That this is an action for refund of manufacturer's excise taxes imposed under § 4161(a) of Title (a) of Title 26, United States Code, arising under Title 28 U.S.C. §§ 1340 and 1346(a)(1).

4. That on or about March 20, 1972, Defendant assessed against Plaintiff a deficiency in excise tax in the sum of $1,232.41 for the period ended September 30, 1968, and interest in the sum of $250.13 for the period ended September 30, 1968, making a total of $1,482.54.

5. That on or about April 25, 1972, Plaintiff paid the Defendant the assessment in the sum of $1,232.41 and interest to May 1, 1972, in the amount of $258.81, making a total of $1,491.22.

6. That on or about May 5, 1972, Plaintiff duly filed a claim for refund of said $1,491.22, which claim was disallowed on or about May 24, 1972.

7. On April 27, 1964, Helmuth Kuntze organized a limited partnership under the name of German Angling Equipment Manufacturing Company (D.A.M.) whose principal place of business was in Berlin, West Germany and manufactured fishing lures and reels which were exported into the United States by Anton W. C. Denker. During the period between 1964 and 1972, the ownership in D.A.M. was as follows:

| Helmuth Kuntze | – | 70,000 D.M. |
| Lutze Kuntze | – | 15,000 D.M. |
| Rupert Kuntze | – | 15,000 D.M. |

8. On May 15, 1953, Deutsche Angelgerate Manufaktur, Helmuth Kuntze, entered into a written agreement appointing Anton W. C. Denker, an export firm of Hamburg, West Germany, the exclusive distributor for their fishing tackle in Canada for a period of one year, for an undetermined period with a three months' notice.

9. On October 14, 1959, the territory of the United States and other specified territories were added to the exclusive export agreement dated May 15, 1953, between D.A.M. and Anton W. E. Denker.

10. From July, 1965 thru July, 1968, the Gladding Co. of Ostilic, New York, a separate unrelated entity, was appointed by Anton W. C. Denker, the exclusive distributor of D.A.M. fishing tackle in the territory of the United States and other specified territories.

11. In July, 1965, Plaintiff (Corex Corporation) was organized under the laws of the State of California, one of the purposes being to import fishing tackle and sporting goods into the United States.

12. Between July 1, 1968 and December 31, 1969, the issued outstanding stock ownership of Corex Corporation consisted as follows:

    65%   Lutze Kuntze
    10%   Rupert Kuntze
    25%   Phil Greyshock

13. That although Lutze Kuntze and Rupert Kuntze were the owners of the majority of the outstanding issued stock of the Plaintiff corporation, they did not control the policies of Plaintiff; they were only two of the four members of the Board of Directors; the other two were Phil Greyshock and Robert Latimer. Phil Greyshock actually ran the corporation. The officers of the corporation were:

    Phil Greyshock, President
    Rupert Kuntze, Vice President
    Robert Latimer, Secretary and
       Treasurer

14. Lutze Kuntze and Rupert Kuntze owned less than 50% of D.A.M. during 1968 to and including 1972. D.A.M. at no time exercised any dominion or control over Plaintiff as an importer or distributor nor was there any business or other dealings between them. Each was a separate entity and conducted their businesses separate and apart from each other.

15. In July, 1965, Anton W. C. Denker appointed Plaintiff as its exclusive importer of D.A.M. fishing tackle in the United States and specified territories.

16. In 1968, Anton W. C. Denker was forced to seek a new distributor because the Gladding Co. decided that it was going to manufacture a competitive reel which would be in conflict in the Quick reel and advised Anton W. C. Denker to look for a new distributor.

17. Anton W. C. Denker was also dissatisfied with the sales effort of the Gladding Co. and suggested that Plaintiff quit the importing business and become the distributor because he knew that Phil Greyshock, the managing officer, Director and a shareholder, knew the product, had extensive knowledge of the American market, was recognized in the field as an expert and had previously sold it as an independent manufacturer's representative for the Bradlow Company when it was the distributor of D.A.M. fishing tackle.

18. When Plaintiff became the distributor it discontinued all of its business activities as an importer for the reason that it is not feasible or customary for a distributor to act as an importer at the same time.

19. Anton W. C. Denker was aware that John H. Nessley, as an employee of the Edward Zerwekh Co., Customs Brokers, through his association with importers, was familiar with their transactions and how they operated. By an Agreement dated August 1, 1968, Anton W. C. Denker alone made the decision to appoint Jon H. Importing Company the sole and exclusive importer of D.A.M. fishing tackle in the United States and specified territories. The term of the Agreement was for so long as Jon H. Importing Company provided reasonable and satisfactory performance in importing said fishing tackle.

20. Another reason for the appointment of Jon H. Importing Company by Anton W. C. Denker was to replace Plaintiff who was giving up the importing business to become the distributor in the place of the Gladding Co. all which was based on sound business reasons, and not motivated for the purpose of evading or avoiding any manufacturer's excise tax as the tax base was the same when Plaintiff was the importer. There

was no evidence that a tax benefit was realized by Plaintiff when it became the distributor.

21. Jon H. Importing Company was a sole proprietorship owned by Ruth Marie Nessley, wife of John H. Nessley, having its place of business in Cypress, California, and it filed a statement and published the Notice required by §§ 17910 through 17917 of the Business and Profession Code of the State of California with the County Recorder of Orange County on August 1, 1968.

22. Neither D.A.M. nor Plaintiff were instrumental or had anything to do with the formation of Jon H. Importing Company. There were no common officers, directors or shareholders of Plaintiff or Jon H. Importing Company. Each was a separate entity and conducted their businesses without any dominion or control over the other.

23. Anton W. C. Denker did not have any financial or other interest in D.A.M., Jon H. Importing Company or Plaintiff.

24. On or about October 7, 1968, Plaintiff and Jon H. Importing Company, two resident citizens of the United States, entered into a written Agreement which recited that Jon H. Importing Company had officially been appointed exclusive importer of D.A.M. Manufacturer's Fishing Products for the United States, including Hawaii, Alaska, Virgin Islands and Puerto Rico, which provided, among other things; Plaintiff shall have first option to purchase all D.A.M. fishing products imported by Jon H. Importing Company. In the event Plaintiff did not exercise its option to purchase a part or all of the imported products, Jon H. Importing Company had the right to sell the balance of the fishing products to other distributors or outlets as it deemed advisable. All prices were on the basis of CIF duty and excise tax paid at Los Angeles Harbor or Customs bonded warehouse, on shipments by ocean vessel. In the event of air shipment, air freight costs would be added to the invoice price, together with delivery charges from airport to Costa Mesa, California. Payment of Jon H. Importing Company's invoices were to be made by a portion on receipt of merchandise, and balance as individually agreed, depending on market conditions and availability of credit.

25. Plaintiff obtained and paid for a license issued by City of Costa Mesa, California for the periods between June 30, 1968 and June 30, 1970, to conduct a wholesale distribution of fishing equipment business at 612 Terminal Way, Costa Mesa, California.

26. Jon H. Importing Company did not at any time act as agent for or obligate Plaintiff in any transaction involving the importation of the fishing tackle or otherwise and all business dealings between Plaintiff and Jon H. Importing Company were that of principal and principal, and not principal and agent, and Jon H. Importing Company was the principal for itself only, in importing the fishing tackle into the United States, and acted independently of Plaintiff who did not invest in, direct or control the operations of Jon H. Importing Company in any shape or form, financial, economic or otherwise. They were separate and distinct types of businesses and neither performed any of the business functions of the other. Each had their own places of business, bank accounts, licenses and no mutual employees.

27. The method, manner and business practices followed by Plaintiff when it was the Importer were not materially changed when Jon H. Importing Company became the Importer, and basically the same type of business that existed when Plaintiff was the Importer continued throughout after Jon H. Importing Company became the Importer. There was no difference in the risks and responsibilities that were assumed by Jon H. Importing Company after it became the Importer.

28. Defendant never challenged the relationship between Plaintiff, when it was the Importer, and the Gladding Co. the Distributor. The only change made was that Jon H. Importing Company was substituted as the Importer in the place of Plaintiff when it took over the distributorship vacated by the Gladding Co.

29. Jon H. Importing Company at all times performed the initial and vital business functions customarily performed by other Importers, and was instrumental and caused the fishing tackle to be shipped into the United States and was not the nominal Importer or conduit for Plaintiff.

30. During the entire period of the agreement between Jon H. Importing Company and Plaintiff, the following business operations and transactions were typical:

(a) Anton W. C. Denker, the exporter, would send to Jon H. Importing Company a projection list of the number of fishing tackle items that it was advised by D.A.M. would be available for export for the coming season.

(b) Upon receipt of the projection list by Jon H. Importing Company, without first consulting Plaintiff, it would advise Anton W. C. Denker that it would purchase all the units available as set forth in the projection list.

(c) Jon H. Importing Company would then submit the projection list to Plaintiff for a commitment to take all or part of the units and alone set a fixed price for each unit of the various models to be imported.

(d) Thereafter, Plaintiff advised Jon H. Importing Company in writing that it would take all or part of the fishing tackle set forth in the projection.

(e) Jon H. Importing Company would receive from Anton W. D. Denker the packing list of the fishing tackle on board each ship as it left Europe, which was only a portion of the fishing tackle items in the projection list. The balance was transported in several shipments at various times.

(f) Jon H. Importing Company would then submit the packing list to Plaintiff, who would issue its purchase order for the units it was purchasing in that particular shipment.

(g) On some occasions Plaintiff would take only a part of the units in the packing list, in which case Jon H. Importing Company did sell the refused units of fishing tackle to other customers.

(h) The fishing tackle upon which the manufacturer's excise tax was assessed herein, arrived at the Port of Los Angeles at various times between August 1, 1968 and December 30, 1969, and were unloaded at the Port of Los Angeles in accordance with the Ocean Bill of Lading.

(i) That all bills of lading issued by the sea carriers were made to the order of the shipper, to wit, Anton W. C. Denker; airway bills were assigned to party to be notified who was Jon H. Importing Company.

(j) That Plaintiff was not named in any of the documents of importation of the fishing tackle, nor was it involved in any manner or form in the importation thereof.

(k) That all of the special customs invoices were prepared and signed by Anton W. C. Denker, who represented to the Bureau of Customs that he was the owner and seller of the fishing tackle to Jon H. Importing Company, the purchaser thereof and the form followed arms-length business motivated considerations.

(l) All of the original documents of importation would be transmitted by Anton W. C. Denker to Jon H. Importing Company, with copies to the Edward Zerwekh Co., Customs Brokers who, pursuant to a Power of Attorney, executed by Jon H. Importing Company, acted as its agent to arrange customs entry in proper form by submitting the required documents to clear customs, which included documents of title (original Bill of Lading), commercial invoice, special customs invoices, bond, estimate of duties, packing list, and application for special permit for immediate delivery.

(m) That all of the consumption and warehouse entries for the fishing tackle were in the name of the Importer, Jon H. Importing Company.

(n) All applications to the Bureau of Customs for immediate delivery permits were made on behalf of Jon H. Importing Company by Edward Zerwekh Company, its Attorney-in-fact.

(o) That all of the original non-negotiable warehouse receipts were in the name of Jon H. Importing Company, who was the owner of the fishing tackle.

(p) That all carriers' certificates and release orders certifying to whom, or upon whose order, the articles described therein must be released, were in the name of Jon H. Importing Company, of Cypress, California, the owner or consignee of such articles within the purview of § 484(h), Tariff Act of 1930. The Release orders directed to the Collector of Customs provided that, in accordance with the provisions of § 484(j), Tariff Act of 1930, authority is hereby given to release the articles covered by the carrier's certificate to Jon H. Importing Company.

(q) Jon H. Importing Company thereafter did withdraw the taxable articles from Customs or Customs Bonded Warehouse, and there existed an underlying economic business substance for the action of Jon H. Importing Company in withdrawing the taxable articles. Plaintiff did not withdraw any taxable articles from a Customs Bonded Warehouse, nor was it entitled to do so.

31. D.A.M. did not have any contact with Jon H. Importing Company, or Plaintiff, and did not direct or exercise any control, or dominion over either of them in the importation of the fishing products.

32. That Jon H. Importing Company was solely responsible, liable and obligated to and did pay Anton W. C. Denker for the fishing tackle, and assumed all risks, liabilities, obligations and losses involved and connected with the importation of the fishing tackle into the United States, which were the same in all respects as those of other importers, among them being: (a) Customs House brokerage fees, (b) Risk in transit, (c) Liability for the truth of all statements in the Customs documents subject to the civil liabilities and criminal penalties provided by statute, (d) marine and warehouse insurance, (e) duties, (f) general term bond liability, (g) extra duty because of erroneous classification by Customs appraisers, (h) wharfage, (i) warehousing, (j) personal property tax on imported merchandise on hand on 1st Monday of March each year, (k) losses incurred by reason of return by Plaintiff of defective imported merchandise, (*l*) Difference between the amount received from insurance and the actual loss, (m) Liability in the event of suits for infringement of patents, (n) Insurance, (o) Payment of manufacturer's excise tax, (p) Pilferage, (q) Costs of administration, (r) All other risks and liabilities, contingent and otherwise, pertaining to doing business as an importer, (s) Jon H. Importing Company made payment directly to Edward W. Zerwekh Co. for the costs and expenses incurred on its behalf for Customs duties, wharfage, insurance, insurance broker's charges, and all other incidental expenses incurred in connection with the clearance of the imported fishing tackle through Customs, (t) All payments made by Jon H. Importing Company were bona fide for itself only.

33. Plaintiff was not liable or obligated to pay Anton W. C. Denker for the fishing tackle it purchased for Jon H. Importing Company; nor did it assume or guarantee the payment thereof. It agreed to pay Jon H. Importing Company only, and was not responsible or obligated to pay any of the costs and expenses of importation.

34. Jon H. Importing Company made the first sale of the fishing tackle in the United States when it sold either "Ex Dock" or "Ex Warehouse." "Ex Dock" means when the imported fishing tackle is released by Customs at the dock, and "Ex Warehouse" means when it is released from a Customs Bonded Warehouse.

35. There was no need for Jon H. Importing Company to maintain an extensive inventory because it sold most of the fishing tackle to Plaintiff upon arrival at the dock in Los Angeles Harbor except on some occasions it used the Customs Bonded Warehouse, or sold to other customers.

36. All contracts and dealings between Jon H. Importing Company and Plaintiff were bona fide sales by Jon H. Importing Company as the Importer and Plaintiff as the Distributor, all of which were legitimate arms-length transactions based on sound business reasons, and were consistent with the terms and conditions of the Agreement between them.

37. Plaintiff did not have any interest of any kind, financial or otherwise, in the imported fishing tackle, and did not intend to and did not take possession or acquire any title until after it had been cleared through Customs and released from Customs custody, or from a Customs Bonded Warehouse after being withdrawn by Jon H. Importing Company, and delivered to Plaintiff's warehouse in Costa Mesa, California.

38. Jon H. Importing Company's insurance covered the fishing tackle up to time of delivery to Plaintiff at its warehouse. Thereafter, Plaintiff's insurance covered the fishing tackle.

39. After the imported fishing tackle was delivered to Plaintiff by Jon H. Importing Company, it would submit its invoice at which time payment of a portion of the invoice would be made in accordance with the Agreement between them. There were no advance payments made by Plaintiff for the fishing tackle before it was received.

40. It is customary for Importers and Distributors in the fishing tackle business to operate independently of each other because of the risk and fluctuation of expenses and costs, which were such that it was not practicable to conduct both businesses, as the Distributors sell to their customers six months in advance at a fixed price per unit. Therefore, it had to be assured by the Importer that the unit price would not be increased, which was another real risk assumed by Jon H. Importing Company.

41. Jon H. Importing Company had ample working capital when it commenced operations as it had established a line of credit with the Crocker Bank in the amount of $25,000.00 and initiated a credit arrangement with Anton W. C. Denker, the exporter so it could extend credit to its customers which is a common practice in the fishing tackle business, and increase the sales by making a greater number of fishing tackle items available to the market and to regain the loss of sales which had decreased during the time that the Gladding Co. was the distributor.

42. The credit arrangement with Anton W. C. Denker at the beginning served as an incentive to increase the sales and an economic business purpose by saving the expense of financing accounts receivable thereby making it possible for Jon H. Importing Company to compete with its competitors who had 90% of the market and were selling comparable purpose reels for less. Jon H. Importing Company was faced with a neglected sales situation, and it had to keep its price as low as possible in order to meet this competition, otherwise it would have been forced out of the market which accounts for the small profit. After October 20th, 1969, Jon H. Importing Company was required to pay in full for the fishing tackle within ten days after arrival.

43. This extension of credit to Jon H. Importing Company together with its expertise was in a large measure responsible for materially increasing the number of fishing tackle to be imported into the United States from 65,000 units in 1968 to 120,-000 units in 1969.

44. Subsequently Jon H. Importing Company established letters of credit with the Bank of America, amounting to $126,-490.00 for the importation of fishing reels and rods from Korea and Japan, which was guaranteed only by Jon H. Importing Company.

45. The amount of Jon H. Importing Company's profit was not a fixed fee or percentage, and was not dictated or fixed by Plaintiff, D.A.M. of Anton W. C. Denker, but was solely determined by it, which was over and above the cost of the fishing tackle, all costs of importation, handling, direct and indirect expenses, excise taxes, duties, taxes and all other risks and liabilities involved in the business of importing the fishing tackle, which varied with each shipment and was commensurate with its investment.

46. Jon H. Importing Company was engaged in activities designed to promote the sale of the fishing tackle by making recommendations and assisting Plaintiff in setting up attractive displays in retail outlets

which are the original source of business, and had been grossly neglected. Also, it suggested the marketing of a package which included a rod, reel, line, lure and hooks which it is now selling. Jon H. Importing Company also gave Plaintiff a promotional allowance to create and increase the sales of line and spools, all of which was in keeping with those actions of an Importer who wishes to broaden the market and thereby increase the demand for his imports. It also made surveys of the financial market and customer's trends in order for Plaintiff to determine the quantities of fishing tackle to purchase for a given year.

47. Subsequent to the trial of this action and rendition of the decision of this Court in favor of Plaintiff, certain new substantial evidentiary facts have become available for the first time, which could not have been obtained by Plaintiff for use at the trial of this action by the exercise of reasonable diligence. Said new evidence is significant and material on the issues of risks and responsibilities of the Importer Jon H. Importing Company and supports a finding that Jon H. Importing Company was the Importer of the fishing tackle, and is as follows:

(a) On April 4, 1969, Jon H. Importing Company reported as required by law under oath to the Assessor of Los Angeles County that it was the owner and had on hand in a warehouse fishing reels of the value of $41,-380.05.

(b) On March 7, 1972, Jon H. Importing Company reported under oath to the Assessor of Los Angeles County that it was the owner and had on hand in a warehouse fishing tackle of the value of $65,000.00.

(c) On March 1, 1975, Jon H. Importing Company reported under oath to the Assessor of Orange County that it was the owner and had on hand in a warehouse fishing tackle and reels of the value of $420,522.35.

(d) Prior to January 14, 1976, States were prohibited by the Import-Expert clause of the United States Constitution from imposing an ad valorem property tax on imported merchandise until they lost their character as imports and became incorporated into the mass of the property of the State. However, the case of *Michelin Tire Co. v. W. L. Wages*, 423 U.S. 276, 96 S.Ct. 535, 46 L.Ed.2d 495, overruled the case of *Low v. Austin*, 13 Wall. 29, 80 U.S. 29, 20 L.Ed. 517 (1872), and held that the assessment of non-discriminatory ad valorem tax on imported tires was not within the constitutional protection against levying of any impost or duty on imports, and as a result of this decision, Jon H. Importing Company was subjected to a new real risk and was obligated and liable for the payment of the assessments for property taxes to the Counties of Los Angeles and Orange for fishing tackle in warehouses on the first Monday of March of each year.

(e) On June 1, 1977, Jon H. Importing Company paid $1,461.04 to the Tax Collector of Los Angeles County for escaped assessment for the year 1972 pursuant to *Hewlett Packard Co. v. County of Santa Clara*, 50 Cal.App.3d 74, 123 Cal.Rptr. 195, which held that personal property taxes could be collected as an escaped assessment.

(f) Jon H. Importing Company is subject to and liable for the payment of the personal property taxes for the years of 1972 and 1975 to Los Angeles and Orange Counties, which as of this date have not been assessed.

(g) These tax liabilities were the sole responsibility of Jon H. Importing Company, and cannot be imposed upon or recovered from Plaintiff, and are one of the real risks of doing business as an Importer, and are the same risk and liability assumed by other Importers.

48. On January 28, 1976, Plaintiff returned to Jon H. Importing Company defective fishing reels of the value of $215,-072.64, and as a consequence Jon H. Importing Company sustained losses amounting to $1,794.64 for loss of 1% non-refundable duty by United States Customs, marine insurance, all costs connected with Customs entry, wharfage, brokerage, insurance, warehousing, cartage and estimated loss of use of money amounting to $1,122.05, which was tied up in duties and excise tax paid on the returned defective fishing tackle.

49. Since the first trial of this cause, Plaintiff learned that the Internal Revenue Service had issued an unpublished ruling known as "Impeco", where the facts were similar to those in the instant case. Plaintiff made a request upon an agent of the Internal Revenue Service for a copy of the ruling, but he refused to make it available. Plaintiff, on October 13, 1977, under the Freedom of Information Act, served a Notice in writing upon the Internal Revenue Service and the United States Attorney, under Rule 34 of the Federal Rules of Civil Procedure to produce within ten working days for inspection a copy of the "Impeco" ruling relating to the imposition of manufacturer's excise tax.

On October 28, 1977, the Internal Revenue Service advised that it could not locate the Ruling and needed more time. The United States Attorney also advised on November 1, 1977, that it could not locate the "Impeco" Ruling.

On November 1, 1977, a representative of the Internal Revenue Service stated to the Court that the "Impeco" Ruling existed, but that it was not applicable, whereupon the Court ordered the United States Attorney to produce to the Court, a copy of the Ruling which is dated February 19, 1958, and contrary to the representations of the agent of the Internal Revenue Service, applies to the facts in this case, and holds:

"Since the officers and stockholders of Taxpayer do not own any of the stock of Company A and the officers and shareholders of the later Company do not own any of the stock of Taxpayer, we must conclude that the sales of fishing tackle between the two companies are not other than arm's length transactions, within the purview of Section 4216(b)(3) of the Internal Revenue Code, but are sales at arm's length on which the 10 percent tax under Section 4161 of the Code is to be computed in accordance with Section 4216(a) of the Code."

50. Except as specifically found herein, none of the allegations in Defendant's Counterclaim are true.

## CONCLUSIONS OF LAW

Based upon the foregoing Findings of Fact, which are made a part of the Conclusions of Law and Judgment herein, the Court concludes as a matter of law:

1. That this Court has jurisdiction of the parties and of the subject matter of this action.

2. The term (Importer), as used in Section 4161(a) of the Internal Revenue Code of 1954, is the person who arranges (as principal, and not as agent) for the goods to be brought into the United States and whose actions bring about the first sale in the United States and the excise tax is placed on the Importer and not the Distributor.

3. D.A.M. was a partnership in which Helmuth Kuntze owned a seventy percent (70%) interest. The other thirty percent (30%) was owned by Lutze Kuntze and Rupert Kuntze, fifteen percent (15%) each. D.A.M. did not at any time have any interest in Plaintiff or exercise any control in any shape or form, business, financial, economic or otherwise.

4. Although Lutze Kuntze and Rupert Kuntze were the owners of a majority of the outstanding issued stock of Plaintiff (Corex), they were only two of four Directors of Plaintiff, the other two being Phil Greyshock and Robert Latimer. Plaintiff was actually operated by Phil Greyshock.

5. Anton W. C. Denker appointed Plaintiff as the distributor in the place of the Gladding Co. because Phil Greyshock had previous experience in selling the fishing tackle as a manufacturer's representative and knowledge of the market.

6. At no time did Phil Greyshock have any connection with D.A.M. or represent it in any manner.

7. Anton W. C. Denker selected and appointed Jon H. Importing Company as the Importer in the place of the Plaintiff for the reason that the Plaintiff was taking over the distributorship from the Gladding Co., who was going to manufacture a com-

petitive reel in Japan, all of which was based on sound legitimate business reasons and not for the purpose of evading or avoiding any manufacturer's excise tax. No tax benefit resulted to Plaintiff by reason of this change of parties as Jon H. Importing Company paid the same rate of excise tax as Plaintiff did when it was the Importer.

8. The formation of Jon H. Importing Company was Jack Nessley's decision and he was selected as the Importer by Anton W. C. Denker who had the worldwide exportation rights of the fishing tackle.

9. Neither D.A.M. nor Plaintiff were instrumental in the formation of Jon H. Importing Company. There were no common officers, directors, or shareholders in Plaintiff or Jon H. Importing Company.

10. The same basic business procedures that existed when Plaintiff was the Importer continued throughout after Jon H. Importing Company became the Importer. The only change made was that Jon H. Importing Company was substituted as the Importer in the place of Plaintiff.

11. Jon H. Importing Company first dealt with the exporter Anton W. C. Denker and without consulting Plaintiff or anyone else, purchased from Anton W. C. Denker, all the fishing tackle available and arranged as principal for itself and not as agent for Plaintiff, to import the fishing tackle and at all times performed the vital business functions customarily performed by other Importers and was solely instrumental and initially caused the fishing tackle to be imported into the United States.

12. Plaintiff and Jon H. Importing Company acted independently of each other and neither Plaintiff nor Anton W. C. Denker had any financial or other interest, nor did they direct or control the operations of Jon H. Importing Company in any shape or form, financial, economic, business, or otherwise.

13. All business dealings between Plaintiff and Jon H. Importing Company were that of principal and principal and not as principal and agent.

14. The Plaintiff did not, as a principal, arrange for, initiate, or cause the taxable articles to be brought into the United States with intent to unload.

15. Plaintiff was not named in any of the documents of importation nor was it involved in any manner in the importation of the fishing tackle, and Jon H. Importing Company did not act as a conduit for Plaintiff.

16. The Edward Zerwekh Co. acted as custom's broker for Plaintiff when it was the Importer and did exactly what it did for it and other clients when Jon H. Importing Company became the Importer.

17. That the first sale of the taxable articles in the geographic United States was made by Jon H. Importing Company which paid the manufacturer's excise tax due thereon.

18. All business dealings between Plaintiff and Jon H. Importing Company were bona fide sales by Jon H. Importing Company as an Importer to Plaintiff, as a distributor, all of which sales were legitimate arm's length transactions and based upon sound business reasons and consistent with the terms and conditions between them. All of Jon H. Importing Company's actions were in keeping with those of an Importer.

19. Plaintiff did not withdraw any of the taxable articles from Customs or a Customs Bonded warehouse, nor was it entitled to do so.

20. Jon H. Importing Company did withdraw the taxable articles from Customs or a Customs Bonded warehouse, and there existed an underlying economic substance for it to withdraw the taxable articles.

21. It has been held by the Internal Revenue Service that a person who withdraws taxable articles from a Customs Bonded warehouse for sale or use in the United States is the "importer" for purposes of the Manufacturer "Excise Taxes". Rev.Rul. 56–409, 56–2 Cum.Bul. 796 amplified by Rev.Rul. 67–209–1967 Cum.Bul. 297 Internal Revenue Service. Plaintiff, therefore, cannot be considered to be an "importer" within the meaning of 26 U.S.C.A. Sec-

tion 4161(a) of the Internal Revenue Code 1954.

22. Jon H. Importing Company was solely responsible, liable and obligated to and did pay Anton W. C. Denker for the imported fishing tackle, and liable for risks and responsibilities of every kind, particularly liability for a $100,000.00 term bond executed in favor of the United States, for obligations and losses involved in connection with the importation of the fishing tackle into the United States, which were the same in all respects as those of other importers.

23. Jon H. Importing Company had ample working capital and credit to conduct its importing business having established a line of credit with the Crocker Bank and initiated an extension of credit from Anton W. C. Denker.

24. The extension of this credit to Jon H. Importing Company by Anton W. C. Denker and the Crocker Bank was a factor which enabled it to increase the sale of reels alone from 65,000 units in 1968 to 120,000 units in 1969.

25. Jon H. Importing Company did engage in promotional and other activities to create sales and to more successfully bring in a greater number of fishing tackle into the United States which resulted in a considerable increase in sales.

26. Subsequently, Jon H. Importing Company established a line of credit with the Bank of America amounting to $126,490.00 for importation of fishing reels and rods from Korea and Japan upon its own guarantee.

27. Jon H. Importing Company's profit was not a fixed fee or percentage, and was not dictated or fixed by Plaintiff or D.A.M. or Anton W. C. Denker, but was solely determined by it which was over and above the costs of the fishing tackle, all costs of importation, direct and indirect expenses, duties, excise tax, taxes and all other risks and contingency expenses which varied with each shipment, which profit was commensurate with its investment. The importation of the fishing tackle by Jon H. Importing Company involved a few shipments each year and did not require full time employees or attention and therefore it had a low overhead.

28. The substance of the transaction between Jon H. Importing Company and Plaintiff was that Plaintiff never had any interest of title in the taxable articles until after they had been cleared and released from Custom's custody or withdrawn from a Customs Bonded warehouse by Jon H. Importing Company and title passed when they were delivered to Plaintiff at its warehouse and Plaintiff did not make advance payments for the fishing tackle until it was received at its warehouse.

29. There were no exceptional circumstances to disregard the form of the transactions between Plaintiff and Jon H. Importing Company and substance, in fact, did exist.

30. Certain new and substantial evidentiary facts became available to Plaintiff for the first time after the trial of this action. Said new evidence bears directly on the issues of risks and responsibilities of Jon H. Importing Company which made it liable to pay to the Counties of Los Angeles and Orange personal property taxes on merchandise in warehouses on the first Monday of March of each year for 1969, 1972 and 1975, by reason of the decision of the Supreme Court in *Michelin Tire Co. v. Wages*, 423 U.S. 276, 96 S.Ct. 535, 46 L.Ed.2d 495, which held that the assessment of nondiscriminatory ad valorem tax on imported tires was not within the constitutional protection against levying any impost or duty on imports. Jon H. Importing Company did pay the County Assessor of Los Angeles County $1,461.04 for the tax year of 1972. In addition, Jon H. Importing Company is liable for personal property taxes for the years 1972 and 1975, which have not been assessed as of this date.

31. As a result of defective reels being returned by Plaintiff, Jon H. Importing Company sustained losses amounting to $1,794.64 in connection with the loss of nonrefundable duty and other expenses in connection with the return of said defective

reels, together with $1,222.05 estimated loss of use of money tied up in duties and excise taxes paid.

■ 32. Since the officers and shareholders of Plaintiff did not own any stock in Jon H. Importing Company and the officers and stockholders of Jon H. Importing Company did not own any stock of Plaintiff and the sales between Plaintiff and Jon H. Importing Company were legitimate arm's length transactions, Plaintiff is not subject to the ten percent (10%) tax under Section 4161 of the Internal Revenue Code and the Internal Revenue Service "Impeco" Ruling dated February 19, 1958.

33. That considering in depth all the evidence, new and additional, testimony, legal documents between the parties, schedules, bank accounts, checks, arm's length dealings between Plaintiff and Jon H. Importing Company; business considerations involving the importer and exporter; formation of Jon H. Importing Company, its capitalization; no common directors or shareholders of Plaintiff in Jon H. Importing Company; sales by Anton W. C. Denker to Jon H. Importing Company and sales by Jon H. Importing Company to Plaintiff; no control by Plaintiff, D.A.M. or Anton W. C. Denker over the operations, financial, economic business policies or otherwise of Jon H. Importing Company; selection of Jon H. Importing Company as the importer by Anton W. C. Denker; law of sales when and where title passed; the risks, liabilities and responsibilities of Jon H. Importing Company and its amount of profit, it follows based on all of the facts and the realities that existed in this case, the statute, decisions and rulings, Jon H. Importing Company was the Importer.

34. Plaintiff was not the Importer of the taxable articles within the meaning of Section 4161(a), Internal Revenue Code of 1954.

35. It follows that the manufacturer's excise taxes in question were illegally and erroneously assessed against, imposed upon and paid by Plaintiff.

36. Plaintiff is entitled to recover from Defendant the sum of $1,491.22, with interest thereon at the rate of six percent (6%) per annum from April 25, until paid, in accordance with the terms and provisions of Section 6611 of the Internal Revenue Code of 1954, together with costs.

37. The Counterclaim is hereby dismissed on its merits on the ground that Defendant is not entitled to a Judgment thereon.

The foregoing Findings of Fact and Conclusions of Law are hereby approved as to form.